DONALD GENE BROOKS,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　Petitioner,　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　　　NO. 3:03-0821
　　　　　　　　　　　　　　　　　)　　　　JUDGE HAYNES
STATE OF TENNESSEE,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　Respondent.　　　　　　　　)

## M E M O R A N D U M

Petitioner, Donald Gene Brooks, filed this action under 28 U.S.C. § 2254 to set aside his state court convictions of first degree felony murder, especially aggravated robbery, theft of property valued over $1,000, and setting fire to personal property for which he received a sentence of life and 27 years. The Court granted Petitioner's motion to appoint counsel and appointed the Federal Public Defender to represent Petitioner. (Docket Entry Nos. 11 and 12). Petitioner's counsel filed four amended petitions (Docket Entry Nos. 19, 22, 43 and 59).[1] With his fourth amended petition, Petitioner presents the following claims:

1.　　　Petitioner received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution;

2.　　　The jury instructions at Petitioner's trial failed to include instructions on lesser included offenses and thereby violated his right to a jury trial and due process of law;

3.　　　There was insufficient evidence for Petitioner's first degree felony murder conviction;

---

[1]The Federal Rules of Civil Procedure can apply in a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005) ; Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ. P. 15 (a), the filing of an amended complaint supercedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended petition to supercede the pro se petition.

4.   Petitioner was denied a full and fair trial because of the State's withholding of exculpatory evidence;

5.   The prosecution knowingly permitted false testimony by several witnesses in violation of Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments; and

6.   The prosecutor engaged in prosecutorial misconduct by comparing Petitioner's alibi witness to the "trickster" coyote in Native American religious mythology.

7.   The Petitioner's statement to the informant whom the State recruited, violated Petitioner's Sixth Amendment right to counsel:

8.   The prosecution failed to disclose that the inmate witness from the Montgomery County jail was a state informant and this inmate was suffering from serious and, longstanding, psychotic mental disorders,

9.   The prosecution failed to disclose critical portions of the informant's prior criminal history and particularly his criminal convictions for crimes involving dishonesty;

10.  The prosecution failed to disclose information known to the State that the informant had given false testimony in a previous trial; and

11.  The prosecution failed to disclose that the informant had a long documented history of providing information to law enforcement and correctional authorities that resulted in special treatment and privileges for the informant.

(Docket Entry Nos. 43 and 59, Third and Fourth Amended Petitions).

Before the Court is the Respondent's motion for summary judgment[2] (Docket Entry No. 45),

contending, in sum: (1) that certain of Petitioner's claims should be dismissed as procedurally

defaulted; (2) that some of Petitioner's claims are barred by the applicable statute of limitations, 28

_____

[2]A motion for summary judgment is a viable procedure to address the merits of a federal habeas petition, Blackledge v. Allison, 431 U.S. 63, 80-81 (1977), but is to be considered consistent with the habeas corpus statutes. Rule 11, Rules Governing Section 2254 Cases. As pertinent here, summary judgment rules in evaluating the evidence do not apply given the statutory presumption of correctness of facts found by the state courts. 28 U.S.C. § 2254(e)(1).

Case 3:03-cv-00821   Document 83   Filed 03/30/07   Page 2 of 48 PageID #: 2191

U.S.C. § 2244(d)(1); and (3) that for the Petitioner's remaining exhausted claims, the Tennessee state courts' decisions are reasonable decisions under the applicable federal law.

In his response, Petitioner contends, in sum: (1) that the applicable federal law and the state record establish that Petitioner is entitled to summary judgment on his claims for the State's use of false testimony and nondisclosure of material exculpatory evidence; (2) that Petitioner's claims are not procedurally defaulted and in any event, he can establish cause and prejudice for any alleged default given the state prosecutor's violation of Brady v. Maryland, 373 U.S. 83 (1963); and (3) that the Court should grant Petitioner an evidentiary hearing. (Docket Entry No. 50, Petitioner's Response in Opposition).

On September 15, 2006, the Court granted the Petitioner's motion for an evidentiary hearing on Petitioner's Brady claims and procedural default issues (Docket Entry No. 51, Order, citing Bell v. Bell, 460 F.3d 739 (6th Cir. 2006), reh'rg en banc granted (6th Cir. Dec. 15, 2006)). The Court's findings of fact on that hearing are set forth below.

## A. FINDINGS OF FACT

### 1. Review of the State Court Record

The Tennessee Court of Criminal Appeals found the following facts[3] that supported Petitioner's convictions:

> On October 28, 1994, Floyd Byrd, a truck driver, spotted a man lying on the side of the road. He drove to Hopkinsville Elevator Company and told two employees to call 911. When the emergency medical personnel arrived on the scene, they could not

---

[3]State appellate court findings in its opinion can constitute factual findings under 28 U.S.C. § 2254(d). Sumner v. Mata, 449 U.S. 539, 546-47 (1981). These factual findings are in the opinion on Petitioner's post-conviction appeal. A lengthier statement of the facts are in the Tennessee Court of Criminal Appeals's opinion on Petitioner's direct appeal. State v. Brooks, 1998 WL 299267 (Tenn. Ct. Crim. App. June 9, 1998).

3

save the victim, Mr. Wisniewski. Shelly Hogue, a secretary at Hopkinsville Elevator, testified that she saw a cream color car speeding up Barge Point Road around 4:00 p.m.. A white man with shoulder length, dark hair was in the car. Adeline Wisniewski, the victim's wife, testified that the victim owned a light beige 1985 Chrysler New Yorker with a handicap license plate.

Edwin Lunceford, an inmate in the Montgomery County jail at the time of trial, testified under a conditional grant of immunity from prosecution. According to Mr. Lunceford, he and Petitioner met at the Pickle Factory on October 28, 1994. The pair drank throughout the afternoon and were joined by Randy Herdman, Rosemary Devito and the victim. At some point, the victim offered to take Mr. Herdman home. Mr. Lunceford, however, actually drove because the victim was intoxicated. Petitioner, Mr. Lunceford, Mr. Herdman and the victim left the Pickle Factory in the victim's car. On the way to Mr. Herdman's house, Petitioner bought a twelve-pack of Bud Light beer. The men dropped Mr. Herdman off at his home and drove off. They stopped to relieve themselves on Barge Point Road. After Mr. Lunceford was finished, he turned around and saw Petitioner holding the victim by the head with a knife to the victim's throat. Petitioner told Mr. Lunceford to get the victim's wallet off the trunk. Mr. Lunceford punched the victim on the jaw so that the victim would not be able to identify them. Petitioner then cut the victim's throat with his knife.

Leaving the victim by the side of the road, Petitioner and Mr. Lunceford drove off, with Petitioner driving. During the afternoon, they bought and smoked some crack cocaine and then drove to Copper Creek. Petitioner gave Mr. Lunceford $40 from the victim's wallet and then threw Petitioner's knife and the wallet onto the creek bank. When Petitioner and Mr. Lunceford inspected the trunk of the victim's car, they found four half gallon containers of whiskey, two cartons of cigarettes, a tool box, and other items.

Petitioner and Mr. Lunceford continued driving around until they headed for the home of Connie Gonzalez, the Petitioner's girlfriend. They parked the victim's car in the breeze way of a church building near Ms. Gonzalez's home, doused the car with charcoal lighter fluid and set it on fire. They spent the night at Ms. Gonzalez's home, drinking and smoking crack cocaine. While they were there, Petitioner hid the victim's car keys in a stuffed animal.

After Mr. Lunceford approached the police, he agreed to wear a "wire" to tape his conversations with Petitioner. During his first conversation, Petitioner admitted killing the victim, but the wire malfunctioned. Later, Petitioner denied knowing anything about the crime, and he laughed when he said that.

At trial, Ms. Gonzalez testified that she called the Pickle Factory earlier in the afternoon to see when Petitioner was going to visit her. Petitioner told her "they"

were going to drop Mr. Herdman off at his house and come on over. Later, when Petitioner had not shown up, Ms. Gonzalez telephoned Mr. Herdman who told her "they" had just left. Petitioner and Mr. Lunceford arrived at Ms. Gonzalez's home an hour and a half to two hours later.

Ms. Gonzalez confirmed that Petitioner and Mr. Lunceford spent the night at her house. She said the men arrived with some beer and two half gallons of whiskey.

Lorena Parr, an employee of the Money Tree, confirmed that Detective Alan Charvis of the Clarksville Police Department, retrieved a tool box from the pawn shop. Detective Charvis testified that the location of the tool box and the identity of the person who pawned it was consistent with the information provided by Mr. Lunceford.

Detective Scott Cutler of the Clarksville Police Department recovered two Bud Light cans from Barge Point Road. The latent fingerprints on the cans matched Petitioner's fingerprints. During a search of Ms. Gonzalez's home, the police officers discovered a torn stuffed animal with the victim's keys and key ring inside.

Doctor Charles Harlan, assistant county medical examiner and consulting forensic pathologist for Montgomery County, conducted an autopsy on the victim. The autopsy revealed a 6.60 inch incision of the victim's neck and trachea which Dr. Harlan testified was consistent with an incision made by a knife. Dr. Harlan also stated that the victim had a fractured jaw and lacerations around the mouth which were inflicted at or near the time of death.

Mike Nelson, an inmate with the Department of Correction, shared a cell with Petitioner in June, 1996. Mr. Nelson testified that the Petitioner told him that Petitioner had killed a man and burned the victim's car at a church.

In support of his defense, Petitioner presented the testimony of Debbie O'Bryan, a former bartender and manager of the Pickle Factory. She recalled that Petitioner, Mr. Lunceford and the victim were at the bar the afternoon of the murder but did not remember seeing Mr. Herdman. According to her testimony, Petitioner left the bar periodically but was never gone longer than ten or fifteen minutes. Petitioner was at the bar when Ms. O'Bryan left to buy cigarettes and chewing gum for the bar, and he was there when she returned forty-five minutes later.

Dorothy Suggs, a part-time employee of the Pickle Factory at the time of the murder, did not learn about the victim's death until some time later. Ms. O'Bryan reminded her that the murder occurred on the day Ms. Suggs had joined the victim and others in drinking at the bar. Ms. Suggs recalled that the victim said he wanted to go to another bar at some point in the afternoon, and it was a patron known as "Boston Rick" who had driven the victim's car, not Mr. Lunceford. Ms. Suggs testified that

Petitioner did not leave with the victim, Mr. Lunceford and Boston Rick.

Melissa Ann Springfield Conner, Fred Lunceford, Robert Lyle and Jonathan Mitchell each testified that Mr. Lunceford had told them about the murder and his cooperation with the police despite the police's order not to discuss the case with others. Mr. Fred Lunceford, Mr. Lyle and Mr. Mitchell testified that Mr. Lunceford had told conflicting stories about the murder.

On this evidence, the jury found Petitioner guilty of first degree felony murder, especially aggravated robbery, theft of property valued over $ 1,000, and setting fire to personal property.

Brooks v. State, 2003WL288434 *2-4 (Tenn. Ct. Crim. App. June 4, 1998).

In his direct appeal, Petitioner challenged only the sufficiency of the State's evidence and the length of his sentence. Petitioner's sufficiency of the evidence claim focused on Lunceford's lack of credibility and the Petitioner's two alibi witnesses who testified that Petitioner was at their bar when the murder occurred. (Docket Entry No. 30, Addendum No. 3, Document 1, Appellant's Brief at pp. 9-10). After an extensive six page review of the evidence at Petitioner's trial, the Tennessee Court of Criminal Appeals concluded:

> The defendant challenges Lunceford's credibility, and the record reflects that defense counsel ably and vigorously cross-examined Lunceford and assailed his credibility through other witnesses. Additionally, the state's evidence at trial supported its theory of the defendant's guilt of each of the four crimes of which he was ultimately convicted, although the defendant brought forward some evidence of an alibi. Thus, the jury had before it evidence which would allow it, on one hand, to convict the defendant, or on the other, to acquit him. The decision was one which hinged on the jury's assessment of the credibility of the witnesses, particularly Edwin Lunceford, and the weight and value which should be afforded the evidence. The decision was wholly one for the jury to make as trier of fact. Unfortunately for the defendant, the jury's discharge of its function resulted in accreditation of Lunceford's testimony and weighing and evaluating the state's evidence over that brought forward by the defense. Clearly, a rational trier of fact, such as the jury at the defendant's trial, could find the defendant guilty beyond a reasonable doubt of each of the four crimes on the evidence presented.

Brooks, 1998 WL 299267 at *6. The Tennessee Court of Criminal Appeals affirmed his conviction

6

and the Tennessee Supreme Court denied his application for permission to appeal. Id. at *1.

On June 21, 1999, Petitioner filed a state post-conviction petition and after appointment of counsel, the state trial court conducted an evidentiary hearing and denied relief except for Petitioner's claim involving his consecutive sentence. Brooks II, 2003 WL288434 at *1. The state trial court found ineffectiveness of counsel, but only in the appellate proceedings. Id. Petitioner appealed that order asserting claims for ineffectiveness of his trial and appellate counsel. Petitioner asserted a "catch-all allegation" or claim "on all other issues raised in his original petition" in the state trial court. Id. at p. 2. As to this "catch all allegation" or claim, the Tennessee Court of Criminal Appeals noted that Petitioner failed "to identify specifically which issues he is referring to and to present any "arguments authorities on references to the record" for those claims. Id. The Tennessee Court of Criminal Appeals deemed those claims "waived under Rule 10(b) of the Court of Criminal Appeals of Tennessee and Tenn. R. App. P. 27(a)(7)." Id.

In his post-conviction appeal, the specifics of the Petitioner's ineffective assistance of counsel claim were set forth in the Tennessee Court of Criminal Appeals' opinion as follows:

> Petitioner now appeals that portion of the post-conviction court's determination that he received effective assistance of counsel at trial and on appeal. Petitioner alleges that trial counsel's conduct was deficient because trial counsel failed to (1) challenge the trial court's charge to the jury on the possible range of punishment for each offense in the indictment except first degree felony murder and improperly referenced life imprisonment without the possibility of parole and death as possible punishments for first degree felony murder when the State did not seek these sentences; (2) object to the trial court's charge to the jury that failed to charge the lesser-included offenses for first degree felony murder; (3) object to improper comments by the prosecution during closing arguments; (4) adequately interview and investigate witnesses who could have strengthened Petitioner's alibi and provided information concerning another potential defendant; and (5) adequately advise Petitioner of his right to testify at trial and insure that Petitioner knowingly waived his right to testify. In addition, Petitioner alleges that his appellate counsel also rendered ineffective assistance when he failed to appeal the trial court's jury instructions, the prosecution's improper comments in closing argument, and the

violation of Petitioner's constitutional right to be heard.

2003 WL 288434 at *2.

In its affirmance, the Tennessee Court of Criminal Appeals made the following findings on the evidence presented at the state post-conviction evidentiary hearing on counsel's failure to conduct an adequate investigation:

> At the post-conviction hearing, Petitioner presented the testimony of Detective Alan Charvis, Dorothy Suggs, Debbie O'Bryan, Randall Herdman, and his trial counsel, Edward DeWerff. Petitioner also testified in his own behalf.
>
> Detective Charvis testified that latent fingerprints had been recovered from a plastic bag and a plastic bottle of lighter fluid found at the crime scene but that the fingerprints had not been identified. Detective Charvis could not recall whether he had discussed these fingerprints with Mr. DeWerff. On cross-examination, Detective Charvis said that the Clarksville Police Department had fingerprinted Richard Roberts.
>
> Mr. DeWerff testified next concerning his representation of Petitioner during the trial. Mr. DeWerff stated that he had little personal recollection of the trial, and Petitioner's file, along with others, were destroyed during a tornado in 1999. He remembered, however, that the relationship with Petitioner was "average," and he had no recollection of any arguments or strains between himself and Petitioner. Although he couldn't remember all of the witnesses he had interviewed, Mr. DeWerff believed he did talk with Dorothy Suggs. In addition, Mr. DeWerff said that he had located a potential alibi witness whose name had been provided by Petitioner, but the man was not able to provide any useful admissible testimony. Mr. DeWerff said that his time sheets indicated that he had at least contacted an investigator, but he could not remember if one was actually hired. Although he could not specifically remember, Mr. DeWerff was confident that he and Petitioner had discussed Petitioner's right to testify at trial.
>
> Dorothy Suggs testified that she arrived at the Pickle Factory the day of the murder around 1:30 p.m. or 2:00 p.m. and joined the victim, Mr. Lunceford and Petitioner in drinking. At some point, the victim indicated that he wanted to go to another bar, and Mr. Roberts volunteered to take him because the victim was intoxicated. The victim, Mr. Roberts and Mr. Lunceford left the bar together, and Petitioner stayed behind, sitting next to Ms. Suggs' husband, Billy Joe Johnson. Ms. Suggs stated that Mr. DeWerff had not interviewed or called her husband, who was now deceased, as a witness at trial. Ms. Suggs said she also knew Rosemary Devito Shepard, Mr. Roberts' ex-girlfriend, and that Mr. Roberts had cut Ms. Shepard's neck during an

8

altercation at some point in their relationship. On cross-examination, Ms. Suggs admitted that her testimony at trial was substantially the same as her testimony at the post-conviction hearing.

Petitioner next took the stand and testified that both he and Mr. DeWerff had remained undecided about whether Petitioner would testify until the trial began. Then, Petitioner said that Mr. DeWerff advised him not to testify so that the prosecution would not get a chance to "chew him up" on cross-examination. Petitioner contends that he should have been given the opportunity to tell the jury that he was not present when the victim was killed. Petitioner admitted, however, that he was at the church when the victim's car was burned. Contrary to Ms. Suggs' testimony, Petitioner also said that he left the Pickle Factory with the victim, Mr. Lunceford and Mr. Herdman, but said that the victim and Mr. Lunceford took him back to the Pickle Factory after they dropped Mr. Herdman off at his house. According to the Petitioner, the victim and Mr. Lunceford then drove off together while Petitioner remained at the bar. Petitioner explained that his fingerprints were on the beer cans found at the crime scene because he was the one who had bought the beer at Beech's Market as the group rode to Mr. Herdman's house.

Two more witnesses testified to the events on the day the victim was killed. Ms. O'Bryan offered little additional information because she left the bar before the victim did, although she, too, had heard the story of Mr. Robert's attack on Ms. Shephard. Mr. Herdman testified that the victim, Mr. Lunceford and Petitioner gave him a ride home. They stopped at Beach's Market, and Petitioner got out to buy beer. When they dropped Mr. Herdman off, one of the men told Mr. Herdman that they were going to ride around in the country and drink beer.

*  *  *

At the post-conviction hearing, Petitioner presented three witnesses. Both Ms. Suggs' and Ms. O'Bryan's testimony at the post-conviction hearing was substantially the same as that at trial. Ms. Suggs did provide testimony that her husband, Billy Joe Johnson, had talked with Petitioner after the victim had left with Mr. Lunceford and Mr. Roberts. Mr. Johnson, now deceased, had not been called as a witness at trial, and Ms. Suggs believed that Mr. Johnson could have corroborated her testimony that Petitioner had not left the bar with the victim. Both women said that Petitioner's trial counsel had not asked them about the altercation between Ms. Shepard and Mr. Roberts in which Mr. Roberts had slit Ms. Shepard's throat.

Randall Herdman next testified on Petitioner's behalf, but his testimony directly contradicted Ms. Suggs' recollections. Mr. Herdman's testimony essentially corroborated Petitioner's testimony at the post-conviction hearing that Petitioner had left the bar in the company of the victim, Mr. Lunceford and Mr. Herdman.

<u>Id.</u> at pp. 4-5.

9

For its disposition of Petitioner's ineffectiveness of counsel claim, the Tennessee Court of Criminal Appeals concluded that Petitioner was not entitled to relief for the reasons discussed in more detail infra.

## 2. The Federal Evidentiary Hearing

Michel Wayne Carter, formerly known as Michael Wayne Nelson, was a State witness at Petitioner's trial. In summary, Carter testified at Petitioner's trial as follows:

> Mike Nelson, a convicted felon incarcerated in the Department of Correction, testified he was in the Montgomery County Jail on June 7, 1996. He and the defendant shared a cell. The defendant told Nelson he might be going to prison because he had killed a man. The defendant said he had cut the victim's throat while another man held the victim. The defendant and his companion took the victim's car, and later they burned it at a church. They stashed the victim's car keys in a stuffed animal at a girl's house. Nelson also testified that the defendant told him the only evidence against the defendant was his companion at the time of the crime. He identified this man as "Tony" or "Eddie" or something similar. The defendant said "Tony" or "Eddie" had been wired by law enforcement, so the defendant had not talked to him about the crime. The defendant wished he had killed his companion, as well.

Brooks, 1998 WL 299267 at *4. (emphasis added).

Carter's questionable reputation for untruthfulness was presented at Petitioner's trial: "Nelson admitted convictions of larceny from a person, grand larceny and escape. At the time of his testimony, he was facing breach of trust charges for failing to return to the Nashville Community Service Center after having made parole." Brooks I, 1998 WL 299267 at *4, n. The Tennessee Court also noted that "Lieutenant Douglas Tackett testified he had known Michael Nelson for about fifteen years and did not believe him to be truthful." Id. at *6.

In this Court, Carter testified that his trial testimony was totally false. According to Carter, a female representative of the district attorney general's office approached him at the jail and told him that she had heard of his past assistance in the Cole case and other cooperation with law

10

enforcement authorities. According to Carter, this representative offered to "take care of" Carter's two pending charges; driving under the influence and parole violation. In exchange, Carter would have to agree to move into Brooks's cell and report what Brooks told him about hiding keys in a stuffed animal at his girl friend's residence. Carter insists that this prosecutor provided him with a written statement with information about Petitioner's girl friend's address and that the victim's automobile has been burned at a nearby church. In a word, Carter agreed and testified at Brooks's trial about Brooks's statements to him that Petitioner killed the victim and hid the victim's car keys at his girlfriend's house.

Carter now insists that his trial testimony about Petitioner's statements to him in the jail was provided by a state prosecutor. Contrary to his trial testimony, Carter testified in this Court that Brooks did not tell him anything about the murder. According to Carter, his trial testimony was based upon a written statement that the prosecutor read to him. Carter denies that he told the prosecutor any of the statements that were in this written statement. Carter also acknowledged that in addition to his convictions cited by the Tennessee appellate courts, his prior criminal history also includes convictions for perjury and passing a forged instrument. (Petitioner's Exhibits 6a, 6b and 6c).

Carter also asserts that he told the assistant district attorney that he had a history of mental illness and at that time, was on medications for those illnesses. According to Carter, he hears voices and is schizophrenic. Excerpts of Carter's medical files from the Tennessee Department of Correction ("TDOC") that detail his multiple suicide attempts and diagnoses of "organic mental disorder with hallucinations," and "schizophrenia" were introduced at the hearing. Petitioner's Exhibit 5 at pp. 20, 22, 24 and 34. According to Carter, TDOC officials placed Carter in protective

11

custody when he was transferred to TDOC. On April 6, 2006, Carter signed a hand-written statement that sets forth his testimony at the evidentiary hearing in this Court. (Petitioner Exhibit No. 1).

On cross-examination, Carter explained that at the time of his arrest, his last name was Nelson, but he later changed his name to Carter, his stepfather's name. Carter was at the jail for a parole violation, i.e., breach of trust when he was absent without leave from a state minimum facility. Carter remained at the jail after Petitioner's trial, pled guilty and spent two years in the TDOC.

Edward Dewerff, Petitioner's trial attorney, started his practice in 1989 and had been an assistant district attorney general. At the time of Petitioner's trial, most of Dewerff practice was criminal law. Although the district attorney had an open file policy, Dewerff filed a Brady motion that sought specific types of information without references to any names. As pertinent here, Dewerff's Brady motion asked the State:

> To reveal to the Defendant the existence of any promise of help, or offer to recommend a reduction in the charge or a sentence of any witness, accomplice, co-conspirator, accessory before or after the fact and/or principal, in exchange for testimony against the Defendant before the Grand Jury and/or during the trial of this case upon the merits.

(Docket Entry No. 42, Addendum No. 1 at p. 10).

Dewerff characterized Carter as an important trial witness. Dewerff did not recall any disclosure by the State that Carter, a state witness, had a perjury conviction. Dewerff cross-examined Carter on his grand theft and larceny convictions as well as seven escapes. According to Dewerff, the jury was aware that Carter was considered a snitch.

Despite awareness of the issues for the hearing, the State did not offer any proof at the hearing. If believed, Carter's testimony presented serious issues of perjury, presentation of false

testimony by state prosecutor(s), withholding exculpatory evidence and violation of Petitioner's right to counsel.

Pursuant to Order of the Court, Helen Young, an assistant district attorney general in the Nineteenth Judicial District at the time of the investigation and Petitioner's subsequent trial, testified that she never talked to Carter. At that time, Young was the only female assistant district attorney and was involved in awarding Lunceford immunity, but was not involved in Petitioner's trial. Young was a child at the time of the <u>Cole</u> conviction cited by Carter. Young explained that witness interviews were usually handled by the City's police detectives. According to police records, Carter's interview that was the basis for his trial testimony, was conducted at the state prison and Young was not present for that interview. Arthur Bieber, an assistant attorney general since 1982 who was the state's prosecutor at Petitioner's trial testified that he did not offer any deal to Carter. Bieber does not go to the jail to interview inmate witnesses unless they are victims. Bieber does not solicit inmates at the jail to elicit information based upon a prior unfortunate event involving similar conduct in that office. Bieber did interview Carter shortly before trial, but not at the jail.

As to the TBI reports on the fingerprints, Young and Bieber explained that there is not any misrepresentation with the TBI agent's testimony or reports. As Young explained, there were two TBI fingerprints reports: one in January, 1995 and the second in August, 1995. The former report reflected an analysis before the State had any information on the identity of the perpetrator(s). The latter TBI fingerprint report was generated after Lunceford came forth to implicate himself and Petitioner in this murder. The August TBI report finds Petitioner's fingerprints on one of the beer cans at the murder scene.

13

### B. Conclusions of Law

### 1. AEDPA Limitations Period

The threshold issue is the Respondent's contention that most of Petitioner's claims in his third and fourth amended petitions are time-barred under 28 U.S.C. § 2244(d)(1), the one year limitation period created by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). In particular, Respondent argues that Petitioner's prior habeas petitions in this action did not include Petitioner's claim based upon Carter's presence at the jail and his testimony at trial. (Docket Entry No. 45, Respondent's Memorandum at p. 24). Petitioner's claims for Carter's alleged false testimony about Petitioner presents a claim under Giglio v. United States, 405 U.S. 150 (1972); the violation of Petitioner's right to counsel due to Carter's status as a state informant presents a claim under Massiah v. United States, 377 U.S. 201(1964); and the prosecutor's alleged nondisclosure of Carter's status as an informant and his criminal history arises under Brady v. Maryland, 373 U.S. 83 (1963).

In response, Petitioner contends, in essence, that these claims are timely under the relation back doctrine under Fed. R. Civ. P. 15(c) and that Petitioner presented the factual bases for these claims in his first and second amended petitions that were timely filed. Further, Petitioner insists that he can demonstrate cause and prejudice for these claims and that AEDPA's limitation period begins to run one year from the date of his discovery of the Brady material. Finally, Petitioner argues that the limitations period should be tolled due to the State's suppression of Carter's false testimony. (Docket Entry No. 50, Petitioner's Response at pp. 6-10).

Under 28 U.S.C. Section 2244(d)(1), a person convicted in state court has one (1) year from the time the conviction becomes final on direct appeal to file a federal petition. Yet, as pertinent

Case 3:03-cv-00821   Document 83   Filed 03/30/07   Page 14 of 48 PageID #: 2203

here, under 28 U.S.C. § 2244(d)(2), "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitations under this subsection." Id. (emphasis added). Moreover, this limitation period can be tolled to permit a claim one year from the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence. 28 U.S.C. §2244(d)(1)(D).

For the statute of limitations issue, Brooks's conviction was affirmed on direct appeal on June 9, 1998. Brooks, 1998 WL 299267 at *1. The Tennessee Supreme Court denied Brooks's application for permission to appeal on December 7, 1998. Brooks did not file a petition for the writ of certiorari to the United States Supreme Court. Although Petitioner did not seek certiorari in the United States Supreme Court, under Abela v. Martin, 348 F.3d 164, 172-73 (6th Cir. 2003) (en banc), the one year period would have been tolled for that the ninety (90) days period until July 12, 1999. Yet, in light of Lawrence v. Florida, ___ U.S.___, 127 S. Ct. 1079, 1081 (2007) that time period is no longer tolled. Petitioner filed his state post-conviction petition on June 21, 1999. (Docket Entry No. 42), Addendum No. 3 thereto at p. 00041). By that time, 196 days had lapsed on ADEPA's one year limitation period. The Tennessee Court of Criminal Appeals affirmed the denial of that petition on February 11, 2003 and the Tennessee Supreme Court denied Petitioner's application for permission to appeal on June 30, 2003. Brooks, 2003 WL 288434 at *1. Petitioner's pro se petition was received in this Court on August 26, 2003 and his petition was filed September 3, 2003. (Docket Entry No. 1, Petition p. 1 and back of p.1). By August 26th, an additional 57 days expired on the limitation period. Two hundred fifty-three (253) days of the AEDPA's 365 days limitation period had passed when this action was filed. Thus, the Court

15

concludes that Petitioner's original petition was timely filed.

As a governing principle, the pendency of a federal habeas action does not toll the limitation period for filing of a federal habeas petition. Duncan v. Walker, 533 U.S. 167, 181-82 (2001). Thus, none of the extensions to file an amended petition in this action can toll the limitations period in AEDPA. Petitioner's first amended petition in this action was filed on October 18, 2004, (Docket Entry No. 19), that is 297 days from the filing of the original petition because the pendency of this action does not toll AEDPA's limitations period. Thus, a total of 550 days had passed on the one year limitation period. By the time the second amended petition was filed on November 22, 2004, an additional 35 days had passed for a total of 585 days. By the time the third amended petition was filed on July 3, 2006, an additional 549 days had expired. With the fourth amended petition on November 16, 2006, a total of 1415 days has passed. By these calculations, all of the Petitioner's claims in his first, second, third and fourth amended petitions are time barred unless a common factual tie exists between the claims in Petitioner's original petition and his claims in these amended petitions.

Under certain conditions, the relation back doctrine under the Fed. R. Civ. P. 15(c)(2) can apply in a habeas action, but only to the extent that its application does not conflict with the AEDPA limitation period. Mayle v. Felix, 545 U.S. 644, 649 (2005). As the Supreme Court stated in Mayle:

> An amended habeas petition, we hold, does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.
>
> * * *
>
> Habeas Corpus Rule 11 permits application of the Federal Rules of Civil Procedure in habeas cases "to the extent that [the civil rules] are not inconsistent with any

16

statutory provisions or [the habeas] rules.". . .Section 2242 specifically provides that habeas applications "may be amended ... as provided in the rules of procedure applicable to civil actions."

\* \* \*

If claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance.

\* \* \*

So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order.

Id. at 650, 654, 662, 664 (emphasis added ).

In his original habeas petition in this action,[4] Petitioner set forth the following claims and factual allegations. Distilled from its argument and citations to legal authorities, Petitioner's original petition made the following factual allegations for his claims:

> Statement of facts notes in this case, and may it please the court, Petitioner makes the statement and convenience for the court to be aware of the entire record regarding testimony of Lunceford and the police statements and the prosecutional misconduct and the ineffectiveness of counsel the out come would have been different: Petitioner request that this court look meticulously at the entire record of the proceeding and of the evidence in the statements by Lunceford the states star witness, and how prosecution withheld evident within the record. Under Rickman page 706 the court stated "that the court finds that the Stated failed to provide material evidence with which Rickman could have effectively cross-examined and impeached Mount, and which demonstrates that Mount testified falsely at trial. This is the same thing that happened to the petitioner when Lunceford gave his testimony. . . .

> Because the State in petitioners case did not produce several records that were both relevant and impeachable, the state . . . practiced deception and enabled the State to find the petitioner guilty, but if not for certain evidence that the State held back and then giving Jen[c]ks material at the last minute then Petitioners case the outcome would have been different.

_____

[4]Consistent with Mayle, the Court quotes Petitioner's claims and operative facts for each claim, but not his argument.

17

* * *

Petitioner was denied appeal to the Tennessee Supreme Court to show his grounds and proof that he was innocent of the charges, therefore his only recourse is by habeas corpus where the trial court presented perjured testimony, ineffective assistance of counsel, and the right guaranteed him through the United States Constitution at trial and on appeal.

ISSUE #3. WHETHER THE PROSECUTION PROCEEDED WITH PERJURED TESTIMONY BY DELAY OF TRIAL FOR A TACTICAL ADVANTAGE.

* * *

Furthermore, prosecutors were aware that they presented perjured testimony by use of the witness, Michael Wayne Nelson. [See: page 7-U of case file]; Nelson alleged that the Petitioner stated to him, Edward Lunceford held the victim while the Petitioner [Brooks, alias "Duck") cut his throat: This does not corroborate with Key Witness Lunceford's testimony [See: T.T.I. page 65, line 4-8: Lunceford direct). Also, Nelson said that Brooks and Lunceford were supposed to have purchased cocaine at Cave Street from a girl named Sissy: That; also does not corroborate with Key Witness Lunceford's testimony [See T.T.I. page 70, lines 1-7: Lunceford direct]. Nelson admitted he was an informant is prison ("snitching") in several cases [See: T.T.I. , page 243, lines 13-21: Nelson direct]. Nelson did not even know the name of the Key Witness as he identified him as "Tony" [See: T.T.II, pages 239-240, lines 2-24: Nelson direct]. And in addition, the Opinion of the Court of Criminal Appeals, filed June 9, 1998, Nelson is re-stated as saying the Petitioner had not spoken with him, i.e., the state witness, Michael Wayne Nelson [See: C.C.A. 9 June 1998 at pp. 9-10]. This reveals the sham that Nelson's testimony is not harmless error but [v]ery damaging and perjured against the Petitioner's case. Had Nelson's sham in testimony on numerous subjects been exposed pre-trial or before the jurors during his trial, the verdict as well as the outcome would have been entirely different.

* * *

Had the Petitioner's defense been provided proper access to all information, the outcome of the State's case would have been entirely different due to the results of proper impeachment of the State's 'Star' witness, and rectification of "Brady" violations therein. The outcome of the jury's verdict and the trial court's judgment would have been dramatically different.

ISSUE #8 WHETHER JUDICIAL ARBITRARINESS IN VIOLATION OF JENCKS DOCTRINE ROSE TO SUCH A LEVEL OF ABUSE OF DISCRETION FROM THE BENCH, AS TAINT WAS LEFT ON THE PROCEEDING WHICH

18

INFECTED TRIAL TO THE EXTENT THE DEFENSE WAS DENIED
FUNDAMENTAL FAIRNESS BY RESIDUAL AND INHERENT PREJUDICE.

The Petitioner alleges as fact the trial court erred egregiously, on March 6, 1996,
when all parties involved for both the defense and the prosecution, appeared before
the Honorable John H. Gasaway, II, Trial Judge, to act upon the Motions of
Discovery for the defense.

On March 6, 1996, Judge Gasaway ordered that all matters of discovery would be
provided to the defense, i.e., the Petitioner within ten (10) days of that date, or Judge
Gasaway would dismiss the indictment. Respectfully, the Petitioner submits that all
discovery was not provided.

* * *

ISSUE # 10 WHETHER THE DEFENDANT IS ENTITLED TO A NEW TRIAL
UPON THE STATES FAILURE TO DISCLOSE "BRADY" INFORMATION,
UNTIL AT TRIAL, SOLICITATION OF "HEARSAY" CONFORMATION OF
THE MURDER WEAPON WAS "COACHED" FROM EXPERT WITNESS
BEFORE THE JURY.

* * *

On June 9, 1995: During the preliminary hearing, June 9, 1995, T.B.I. Agent Phillips
said that he had developed fingerprint of Exhibit 37890 (i.e., beer can). and
"identified" it as the left thumb print of the petitioner, pro se, according to his report
dated June 8, 1995 [See: Preliminary Hearing Transcript, page 60, lines 2-15],

According to the T.B.I. Agent, Mr, Phillips, however, [See: Examination Report of
Exhibit 40037890 (Beer Can); See, also: page 17-F of Case File. l, an ".....
identification was not made.....,', by the same said T.B.I. Agent, of the Petitioner, pro
se [See: Page 17-F of Case File], re. June 8, 1995 examination.

Again, at the preliminary hearing, on June 9, 1995, T.B.I. Agent Phillips during his
testimony, stated he removed a "Latent: fingerprint off of Exhibit 37891 (i.e., Beer
Can), although previously, identification had not been made from this can [See: Trial
Transcripts (T.T.I or II), pages 60-61], nevertheless, at trial, T.B.L Agent Phillips
[Se: Trial Transcripts T.T.I. or tr), page 61, lines 4-5] stated this fingerprint was a
palm print, although this same said Agent confirmed this Exhibit 40037891 (i.e.,
Beer Can) was not identified [See: 17-F & i7-G of Case File]. With such
contradictory historic statements, the Petitioner pro se, alleges as fact that he (i.e.
Defendant and Petitioner Donald Gene Brooks), as of the preliminary hearing on
June 9, 1995, did not have his finger or palm prints identified on Exhibit 40037891.
What shall the petitioner pro se do? on June 8, 1995 and June 9, 1995, he protested
vigorously for his Appointed Counsel to pursue this critical matter, but his requests

19

were refused. . . .

* * *

Now, T.B.I. Agent, Mr. Phillips, according to his "official" latent fingerprint report [See: page 17-A of Case File], concludes on identification with the left palm print of the Petitioner, pro se, was finally obtained, Over two months after the preliminary hearing of the Petitioner, pro se, with no resistance by appointed counsel as "Amicus Curiae", Agent Phillips was allowed to present perjured testimony which enabled the prosecution to obtain its heart's desire, to have the case of the Petitioner, pro se, bound over to the Grand Jury.

During the trial of the Petitioner, pro se, on examination, T.B.I. Agent Mr. Phillips, was asked by General Bieber, where the Pro Se Petitioner's palm print was obtained? But, when T.B.I. Agent, Mr. Phillips, attempted to answer." ... when it [sic: palm print] was received," the presiding Judge interrupted to instruct General Bieber that this line of questioning needed to be developed again [See: T.T.I, pages 223-224,lines l4-8: General Bieber direct].

(Docket Entry No. 1, Original petition at pp. 5, 10, 13, 14, 23-24, 28, 39, 40) (emphasis added).

Upon review of the portions of his original petition, particularly the underscored portions, the Court concludes that Petitioner's original petition that was timely filed, has sufficient and common operative facts to establish a direct tie with his Brady, Giglio and Massiah claims in his amended petition about the testimony of Carter and the State's expert at his trial. Thus, under Mayle, the Court concludes that Petitioner's Brady and Giglio claims are timely under the AEDPA. Whether these claims that are premised on Carter's testimony, are defaulted and/or have merit are separate issues.

### 2. Procedural Default

Respondent's procedural default defense is that Petitioner's Brady, Giglio and Massiah claims were never presented to the state courts nor were several of his claims about his counsel's ineffectiveness. Here, Tennessee's one year limitations period, Tenn. Code Ann. § 39-40-102 is the obvious applicable state rule because that one year period for filing state post-conviction petition

20

has long passed. Thus, Respondent, argues that petitioner cannot now pursue his Brady, Giglio and Massiah claims in the state courts. Respondent also argues that Petitioner is presenting new ineffective assistance of counsel claims that were not presented to the state courts, namely: that Petitioner's trial counsel failed to investigate Carolyn Sue Legare, a witness who saw Robert Ricks and another suspect leave the bar with the victim; that trial counsel failed to point out the Edwin Lunceford's trial testimony that he was the one who took the victim's wallet was inconsistent with his testimony at the preliminary hearing, where he testified that Mr. Brooks had the wallet thereby failing to undermine Lunceford's credibility; that trial counsel failure to object to and appellate counsel failure to challenge on appeal – the prosecutor's knowing presentation of TBI Agent Phillips' false testimony about the unidentified latent fingerprint on the beer can found at the crime scene; and trial counsel failure to object to and appellate counsel failed to challenge on appeal, the prosecution's knowing presentation of Mr. Lunceford's false testimony that Petitioner "admitted" to the murder during the "wired" conversation on April 18, 1995.

The "Procedural Default Doctrine" can bar federal habeas relief in the certain instances. Coleman v. Thompson, 501 U.S. 722, 729-30 (1991). The rationale for this doctrine arises out of judicial respect for federalism and maintaining comity with state courts, id at 730-32, and to serve a legitimate state interest in finality of state convictions. Francis v. Henderson, 425 U.S. 536, 542 (1976). State procedural rules that channel the controversy to the state trial and appellate courts must be honored because failure to do so" deprives the [state] appellate court of an opportunity to review trial error, and undercut[s] the state's ability to enforce its procedural rule[s]". Murray v. Carrier, 477 U.S. 478, 490-91 (1986) (quoting Engle v. Isaac, 456 U.S. 107 129 (1982), and Reed v. Ross, 468 U.S. 1, 10 (1984)).

The Sixth Circuit defined the analysis under procedural default doctrine in the Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986):

When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.

\*\*\*

Second, the court must decide whether the state courts actually enforced the state procedural sanction.

\*\*\*

Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.... This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

Id. at 138 (citations omitted).

For procedural default purposes, the State's limitation period for filing post-conviction challenges has been found to be an adequate and independent state rule that is regularly enforced. In Coleman, the Supreme Court upheld a procedural rule that barred consideration of a federal claim for failure to meet state law requirements for timely appeals. 501 U.S. at 750-51. "'No procedural principle is more familiar to this court than that a constitutional right may be forfeited in criminal as well as in civil cases by the failure to make timely assertions of the right before a tribunal having jurisdiction to determine it'. . .No less respect should be given to state rules of procedure." Id. at 751 (quoting Yakus v. United States, 321 U.S. 414, 444 (1944)). In Hutchison v. Bell, 303 F.3d 720, 788-89 (6th Cir. 2002) the Sixth Circuit found Tennessee's statute of limitations statute on post-conviction petitions to satisfy all the requirements for the procedural default doctrine.

Based upon Coleman, and Hutchison, the Court concludes that Tennessee's limitations period for post-conviction petition is an independent, adequate and regularly enforced state rule that

22

bars Petitioner's <u>Brady</u>, <u>Giglio</u> and <u>Massiah</u> claims as well as his ineffective assistance of counsel claim premised upon the Legare witness.

With this procedural default, the Petitioner must show cause for the procedural default and actual prejudice therefrom. <u>Coleman</u>, 501 U.S. at 752-53. Cause for a procedural default must depend on some "objective factor external to the defense" that interfered with the Petitioner's efforts to comply with the procedural rule. <u>Id</u>.

On whether some of Petitioner's claims are procedurally defaulted, the Court considers first Petitioner's claims under <u>Giglio v. United States</u>, 405 U.S. 153-54 (1972), <u>Brady</u>, and <u>Massiah v. United States</u>, 377 U.S. 201 (1964) that clearly were not presented to the state courts and clearly are subject to procedural default. Here, Petitioner's trial counsel filed a <u>Brady</u> motion that specifically requested the type of information about Carter that was presented at the evidentiary hearing in this action. Despite this motion, Petitioner's trial counsel testified that he never received this evidence from the State.

A <u>Brady</u> violation can qualify as cause to excuse a procedural default. In <u>Banks v. Dretke</u>, 540 U.S. 668, 698 (2004), the Supreme Court held that where the state prosecutors represent that there is not any <u>Brady</u> material and the habeas petitioner presents such materials in a habeas action, the habeas petitioner "has shown cause for failing to present evidence in the state court" for his <u>Brady</u> claim. As the Sixth Circuit stated: "Suppression or favorable impeaching evidence by the state that results in an inability to raise claims relating to that evidence in state court establishes cause for the ensuing default." <u>Hutchison</u>, 303 F.3d at 741. Yet, for a showing of prejudice, "unless the alleged <u>Brady</u> evidence is 'material' for the purposes of the <u>Brady</u> rule, its 'suppression d[oes] not give rise to sufficient prejudice to overcome the procedural default.'" <u>Id</u>. (quoting <u>Strickland</u>

v. Greene, 527 U.S. 263, 282 (1999).

Here, the Court concludes that Petitioner has established cause for his claims arising out of Carter's recanting of his trial testimony. That fact is external to Petitioner. Whether the requisite prejudice is shown, requires a consideration of the legal standards for these claims.

In Brady, the Supreme Court held that: "[s]upression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.[5]

Brady's disclosure mandate arises in three contexts:

> The first situation was the prosecutor's knowing use of perjured testimony or, equivalently, the prosecutor's knowing failure to disclose that testimony used to convict the defendant was false. The Court noted the well-established rule that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.

> At the other extreme is the situation in Agurs itself, where the defendant does not make a Brady request and the prosecutor fails to disclose certain evidence favorable to the accused. The Court rejected a harmless-error rule in that situation, because under that rule every nondisclosure is treated as error, thus imposing on the prosecutor a constitutional duty to deliver his entire file to defense counsel. At the same time, the Court rejected a standard that would require the defendant to demonstrate that the evidence if disclosed probably would have resulted in acquittal.

> * * *

> The standard of materiality applicable in the absence of a specific Brady request is therefore stricter than the harmless-error standard but more lenient to the defense than the newly-discovered-evidence standard.

> The third situation identified by the Court in Agurs is where the defense makes a specific request and the prosecutor fails to disclose responsive evidence. ...

---

[5] Brady's holding is premised, in part upon Napue. United States v. Bagley, 473 U.S. 667, 679 n. 8 ("..the Brady rule has its roots in a series of cases dealing with convictions based on the prosecution's knowing use of perjured testimony" citing Napue and Mooney v. Holohan, 294 U.S. 103 (1935)).

24

> "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable."

473 U.S. at 678-79, 680, 681 (quoting United States v. Agurs, 427 U.S. 97, 106 (1976) with emphasis added)).

For habeas relief on a Brady claim, the evidence at issue must be material. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682. Later, in Kyles v. Whitley, 514 U.S. 419, 434 (1995), the Supreme Court explained that "a showing of materiality does not require demonstration by a preponderance that the suppressed evidence would have resulted ultimately in the defendant's acquittal ... The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."

At the time of Petitioner's trial, Supreme Court precedents were: " well-established [that] ... a defendant's right to a fair trial may be violated where the prosecution deliberately misleads a jury or allows misleading testimony to go uncorrected with respect to any promise offered to a key prosecution witness in exchange for his testimony." Carter v. Mitchell, 443 F.3d 517, 535 (6th Cir. 2006) citing Giglio, 405 U.S. at 153-54 and Napue v. Illinois, 360 U.S. 264, 269 (1959). In Giglio, the Supreme Court stated "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." 405 U.S. at 153 (citations and internal quotations omitted). "[A] conviction obtained through use of false testimony, known to be such by representatives of the State, must fall under the Fourteenth Amendment ....The

25

same result obtains when, the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269 (citations omitted). For this claim, Petitioner must prove "(1) the evidence the prosecution presented was false; (2) the prosecution knew it was false; and (3) the false evidence was material." Workman v. Bell, 178 F.3d 759, 766 (6th Cir. 1998).

In Massiah, the government used a cooperating co-defendant and a monitoring device to elicit admissions from the defendant. The Supreme Court held that :

> [W]here the specific guarantee of the Sixth Amendment directly applies... We hold that the Petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted an in the absence of his counsel.

377 U.S. at 205-06.

Later, the Supreme Court stated that "the primary concerns of the Massiah line of cases is secret interrogation by the investigating techniques that are the equivalent of direct police interrogation ... [A] defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, report his incriminating statements to the police." Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

As discussed earlier, the Tennessee Court of Criminal Appeals found that the key witness against Petitioner was Lunceford. "... [T]he jury had before it evidence which would allow it, on one hand, to convict the defendant, or on the other, to acquit him. *The decision was one which hinged on the jury's assessment of the credibility of the witnesses, particularly Edwin Lunceford,* and the weight and value which should be afforded the evidence  whose credibility was attacked by several witnesses." Brooks, 1998 WL 299267 at *6. (emphasis added).  Yet, Carter's trial testimony was that Petitioner admitted the murder, as described by Lunceford and that testimony reflects an

26

incriminating admission by Petitioner.

On its face, Carter's testimony has obvious factual appeal. Carter has a history of being considered a "snitch" and this fact, coupled with his presence in Petitioner's cell and his trial testimony, tend to corroborate his testimony that state prosecutors approached him for that purpose. Carter's testimony in this action is contrary to his self-interest as such testimony exposes him to a charge of perjury. As to Carter's testimony about his disclosure of his mental condition to the state prosecutor prior to his trial testimony, the TDOC medical records corroborate that he has such a mental condition. The state record reflects that the state prosecutors should have had cause to question whether to call Carter as a witness. At trial, a local police officer testified that Carter was not credible, as the state appellate court noted: "Lieutenant Douglas Tackett testified he had known Michel Nelson for about fifteen years and did not believe him to be truthful." Brooks I, 1998 WL 299267 at *6. As noted, Petitioner's trial counsel filed a Brady motion with a specific request for evidence of the State's promises to any witness.

A general rule, "[t]he assessment of the credibility of witness is generally beyond the scope of [habeas] review." Schlup v. Delo, 513 U.S. 298, 330 (2003), but the court must do so in such instances of new evidence that seriously challenges the Petitioner's conviction. Here, as found by the Tennessee appellate court, Lunsford's testimony was the critical basis for Petitioner's conviction. Given Carter's mental history, his prior convictions and reputation for untruthfulness, his inconsistent testimony about his role in these matters, and the testimony of the state prosecutors, the Court finds that Carter's testimony about the state prosecutors is not credible. The Court also finds the state prosecutors' testimony about the TBI fingerprint reports to be credible.

The state counsel's examination of the state prosecutors, however, did not address

27

Petitioner's assertions that disclosures of his criminal convictions for perjury and passing a forged instrument were not disclosed to Petitioner's trial counsel as requested in his Brady motion. Standing alone, this nondisclosure would be material under Brady. Yet, the state trial court record reflects Carter's other convictions, the testimony that Carter was a snitch who testified for the State in exchange for favorable treatment and significantly, the testimony of a law enforcement official who had known Carter for fifteen years, that Carter was an unreliable and untruthful witness not worthy of belief. The latter testimony leads the Court to conclude that the State's failure to disclose these other convictions are not material for Brady purposes because the Court's confidence in the verdict is not undermined. As a result, there is not any showing of prejudice to excuse the procedural default.

Thus, Petitioner's Brady claim does not involve material evidence in light of Carter's lack of credibility and the explanation of the TBI fingerprint reports. Petitioner's related Giglio and Massiah fail for the same factual reason, i.e., Carter's lack of credibility that is the core of these claims.

As to Petitioner's ineffective assistance of counsel claims that are challenged as procedurally defaulted, those claims are: that Petitioner's trial counsel failed to investigate Carolyn Sue Legare, a witness who saw Robert Ricks and another suspect leave the bar with the victim; that trial counsel failed to point out the Edwin Lunceford's trial testimony that he was the one who took the victim's wallet was inconsistent with his testimony at the preliminary hearing, where he testified that Mr. Brooks had the wallet thereby failing to undermine Lunceford's credibility; that trial counsel failure to object to and appellate counsel failure to challenge on appeal – the prosecutor's knowing presentation of TBI Agent Phillips' false testimony about the unidentified

28

latent fingerprint on the beer can found at the crime scene; and trial counsel failure to object to and appellate counsel failed to challenge on appeal, the prosecution's knowing presentation of Mr. Lunceford's false testimony that Petitioner "admitted" to the murder during the "wired" conversation on April 18, 1995.

The Tennessee Court of Criminal Appeals described Petitioner's ineffective assistance of counsel claims on his post-conviction appeal as follows:

> Petitioner now appeals that portion of the post-conviction court's determination that he received effective assistance of counsel at trial and on appeal. Petitioner alleges that trial counsel's conduct was deficient because trial counsel failed to (1) challenge the trial court's charge to the jury on the possible range of punishment for each offense in the indictment except first degree felony murder and improperly referenced life imprisonment without the possibility of parole and death as possible punishments for first degree felony murder when the State did not seek these sentences; (2) object to the trial court's charge to the jury that failed to charge the lesser-included offenses for first degree felony murder; (3) object to improper comments by the prosecution during closing arguments; (4) adequately interview and investigate witnesses who could have strengthened Petitioner's alibi and provided information concerning another potential defendant; and (5) adequately advise Petitioner of his right to testify at trial and insure that Petitioner knowingly waived his right to testify. In addition, Petitioner alleges that his appellate counsel also rendered ineffective assistance when he failed to appeal the trial court's jury instructions, the prosecution's improper comments in closing argument, and the violation of Petitioner's constitutional right to be heard.

2003 WL 288434 at *2.

From the Court's review of the state record and the factual circumstances for those claims, the Petitioner did not raise these disputed claims in the state courts. An omission of post-conviction counsel cannot establish cause. Ritchie v. Eberhart, 11 F.3d 587, 591-92 (6th Cir. 1993). The habeas statute codified this principle. 28 U.S.C. § 2244(1). The Court deems the state court decisions that the Petitioner's trial and appellate counsel provided effective assistance to be reasonable. Thus, Petitioner cannot establish prejudice for those errors or omissions. In summary,

29

Petitioner's <u>Brady</u>, <u>Giglio</u> and <u>Massiah</u> and new ineffective assistance of counsel claims are procedurally defaulted.

### 3. The Merits of Petitioner's Exhausted Claims

The merits of Petitioner's claims are governed by AEDPA's provisions. <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. <u>Id.</u> The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States"as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. <u>Id.</u> at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time the Petitioner's state court conviction became final." <u>Id</u>. at 390; accord, <u>Joshua v. Dewitt</u>, 341 F.3d 430, 436 (6th Cir. 2003). In <u>Bell v. Cone</u>, 535 U.S 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect

30

to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," Williams, 529 U.S. at 409, and a district court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

### 1. Ineffective Assistance of Counsel Claims

As to his ineffective assistance of counsel claims, the state courts considered only the following claims:

> 1) counsel failed to adequately identify, locate, interview, and investigate witnesses who could have strengthened Mr. Brooks' alibi or shed light on the actions of Mr. Brooks on the day of the offense and also on the action of other witnesses or potential defendants;
>
> 2) counsel failed to adequately advise Mr. Brooks of his rights to testify at trial and

31

to insure that Mr. Brooks knowingly waived his right to testify;

3) counsel failed to object to – jury instructions that did not include the lesser included offenses for first degree felony murder;

4) counsel failed to object to – and appellate counsel failed to challenge on appeal the prosecutor's improper comments during closing argument that compared Petitioner's primary alibi witness to the lying "trickster" coyote of Native American mythology;

5) counsel failed to object – and appellate counsel failed to challenge on appeal – an instruction to the jury that improperly referred sentences to both death and life without possibility of parole when the state was not seeking those sentences, an error compounded by counsel's failure to request an instruction informing the jury that Mr. Brooks would have to serve a minimum of twenty-five years before being eligible for parole, as required by Tenn. Code Ann. 40-35-201(b)(2)(A)(I); and

6) counsel failed to appeal the Petitioner's consecutive sentence.

(Docket Entry No. 43, Third Amended Petition at pp. 14-16). As found earlier, the remaining sub-parts of this claim are procedurally defaulted, supra at pp. 28-29, but the claims quoted above were presented in Petitioner's post-conviction appeal.

To evaluate these claims , the Sixth Circuit summarized the Supreme Court's precedents governing legal principles on ineffective assistance of counsel claims. In Mitchell v. Mason, 325 F.3d 732 (6th Cir. 2003), the Sixth Circuit identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at the critical stage of the proceeding for which presumed prejudice arises; and (2) counsel whose performance was deficient on specific issues and was demonstrably prejudicial to the defendant. As that Court explained:

In United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) . . . the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." In Williams, the Supreme Court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel,

32

requiring proof of deficient performance and prejudice provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." Williams, 529 U.S. at 391 . . . (citing Strickland, 466 U.S. at 692, 104 S.Ct. 2052). We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel. Olden, 224 F.3d at 568 (prejudice is presumed when counsel is absent during prosecution's presentation of evidence that implicates defendant because such absence occurred during "critical stage" of trial).

325 F.3d at 740.

Within the first category are three types of presumptive ineffectiveness of counsel:

The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The second is when counsel "'entirely fails to subject the prosecutions' case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

Id. at 742.

Here, from the review of the state court record, the Court concludes that Petitioner's ineffective assistance of counsel claims fall within the Strickland standard.

To prevail on these claims of ineffective assistance, Petitioner must demonstrate that, under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. Strickland, 466 U.S. at 695. As the Supreme Court has explained:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains

33

simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland,

"counsel has a duty to make reasonable investigations or to make a reasonable decision that

makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 690-91 (emphasis added).

In other words, counsel has a duty to make reasonable investigations or to make a reasonable

decision that makes particular investigations unnecessary. Wiggins v. Smith, 539 U.S. 510, 521

(2005). Counsel's failure "to conduct constitutionally adequate pretrial investigation into potential

evidence" can "hamper[] [their] ability to make strategic choices." Harris v. Bell, 417 F.3d 631, 639

(6th Cir. 2005). See also Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991) ("[O]ur case law

34

rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."). As the Sixth Circuit observed on whether counsel's failures were constitutionally infirm, that:

> The Supreme Court recognized that in the context of ineffective assistance claims based on counsel's `failure to investigate,' the temptation to rely on hindsight is particularly strong. Consequently, the Court made clear that strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable....' Id. at 690, 104 S.Ct. at 2066. However, ` strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 690-91, 104 S.Ct. at 2066 (emphasis added).

Sims v. Livesay, 970 F.2d 1575, 1579-80 (6th Cir. 1992) (emphasis added). Claims of ineffective assistance of counsel present mixed questions of law and fact. Mitchell, 325 F.3d at 738.

On the jury instruction related claims, Petitioner contends that trial counsel failed to object at trial or to challenge on appeal a jury instruction that referenced sentences of both death and life without the possibility of parole for first degree murder when the State was not seeking those sentences and for failing to request a jury instruction that petitioner must serve a minimum of 25 years before he is eligible for parole. The jury instruction at issue was as follows: "The punishment for [first degree felony murder] is life imprisonment, life imprisonment without the possibility of parole, or death by electrocution. The State, however, is not seeking the death penalty or life imprisonment without the possibility of parole and, therefore, should you return a verdict of guilty, this court will impose a life sentence." (Docket Entry No. , Addendum 4, Doc. 3, p. 8). Petitioner raised this claim on appeal from the order denying his petition for post-conviction relief.

In that appeal, the state appellate court ruled that the trial court's instruction accurately informed the jury as to the consequences of a guilty verdict and was consistent with Tennessee law

35

and that Petitioner failed to show counsel's conduct was either deficient or prejudicial.

Petitioner alleges first that trial counsel rendered ineffective assistance when he failed to object to the trial court's charge to the jury outlining the range of punishment for the offenses listed in the indictment. Specifically, Petitioner contends that the jury instructions were improper because the trial court failed to inform the jury as to the minimum number of years that Petitioner would have to serve on his life sentence before he was eligible for parole. Secondly, Petitioner contends that trial counsel improperly failed to object to the trial court's reference to life imprisonment without the possibility of parole and death as possible punishments for first degree felony murder when the State did not seek either punishment. Finally, Petitioner alleges that appellate counsel rendered ineffective assistance when he failed to raise these issues on appeal.

At the time of Petitioner's trial in 1996, the trial court was required to instruct the jury as to the possible penalties for each offense charged and lesser-included offenses, upon motion of either party. Tenn. Code Ann. § 40-35-201(b)(1) (repealed 1998). If a party requested a charge as to possible penalties, the trial court was also required to include in the jury instructions an approximate calculation of the minimum number of years the defendant must serve before eligible for parole. Tenn. Code Ann. § 40-35-201(2)(A)(i)(amended 1998).

The mandate that jurors be informed of the possible punishments facing a defendant reflected the public's "desire for truth in the sentencing process." *State v. King*, 973 S.W2d 586, 591 (Tenn. 1998)....

\* \* \*

In the case *sub judice*, the trial court's charge to the jury on first degree felony murder concluded with the following statement:

The punishment for [first degree felony murder] is life imprisonment, life imprisonment without the possibility of parole, or death by electrocution. The State, however, is not seeking the death penalty or life imprisonment without the possibility of parole and, therefore, should you return a verdict of guilty, this court will impose a life sentence.

Petitioner argues that this instruction impermissibly leads the jury to believe that life imprisonment is a significantly less sentence than life without the possibility of parole, especially since the trial court did not inform the jury that Petitioner would actually have to serve at least twenty-five years before he was eligible for parole. *See* Tenn. Code Ann. § 39-13-204(e)(2).

36

The post-conviction court concluded that the jury instruction as given provided relevant information to the jurors, and that people are aware that the death penalty is a possible penalty for first degree murder in Tennessee. <u>The post-conviction court found that the instruction accurately informed the jury as to the consequences of a guilty verdict and relieved the jurors of any concerns or apprehension as to the possibility of a death sentence in the case before them. We agree with the post-conviction court's findings that Petitioner has failed to show that trial counsel or appellate counsel's conduct was either deficient or prejudicial to Petitioner in failing to object to this jury instruction.</u> Petitioner is not entitled to relief on this issue.

* * *

Based on the record, it is highly improbable that the jury would have opted for acquittal rather than conviction. Accordingly, whether or not in this instance the trial court's charge did not follow the statutory requirements mandated by Tenn. Code Ann. § 40-35-201(b) in effect at the time of Petitioner's trial, Petitioner has not demonstrated that there is a reasonable probability that a clearer jury instruction would have led to a different result in the trial.

2003WL288434 at *6, 7and 8.

As to the claim about the lack of jury instructions on parole eligibility and lesser included offenses, the state court concluded that petitioner had not demonstrated that he was prejudiced either by the instruction or by his counsel's failure to raise the issue on direct appeal. In sum, the Tennessee Court of Appeals observed that life imprisonment is the lowest sentence available for first degree murder under Tennessee law. To demonstrate prejudice, petitioner would have to show that the jury would have acquitted him of first degree murder if it had been provided the instructions now requested.

The trial court's charge to the jury also defined the punishment for first degree felony murder as "a sentence of life in the state penitentiary," and did not include the minimum number of years that must be served before Petitioner was eligible for parole. Petitioner contends that his trial counsel rendered ineffective assistance when he failed to object to the trial court's omission of information concerning Petitioner's parole eligibility. Relying upon the Tennessee Supreme Court's holding in *Dean v. State*, 59 S.W. 3d 663 (Tenn. 2001), Petitioner submits that trial counsel's failure to object to the trial court's instructions was prejudicial

37

error. Petitioner also alleges that appellate counsel rendered ineffective assistance when he failed to raise the appropriateness of this jury instruction on appeal.

\* \* \*

The jury charge challenged by Petitioner in the case *sub judice* is clearly distinguishable from the jury charge reviewed in *Dean*. Unlike *Dean*, the jury convicted Petitioner of first degree felony murder, and the trial court sentenced him to life imprisonment. Life imprisonment is the lowest sentence available to one convicted of first degree murder. Tenn. Code Ann. § 39-13-202(c). Therefore, to show he was prejudiced by the jury instructions, Petitioner would have to demonstrate that the jury would have acquitted him of first degree felony murder had it been provided the jury instructions now requested by Petitioner. Based on the record, it is highly improbable that the jury would have opted for acquittal rather than conviction. Accordingly, whether or not in this instance the trial court's charge did not follow the statutory requirements mandated by Tenn. Code Ann. § 40-35-201(b) in effect at the time of Petitioner's trial, Petitioner has not demonstrated that there is a reasonable probability that a clearer jury instruction would have led to a different result in the trial. Petitioner has also not demonstrated that he was prejudiced by the failure of his appellate counsel to raise the appropriateness of this jury instruction on appeal. Petitioner, therefore, is not entitled to relief on this issue.

Finally, Petitioner contends that trial counsel provided ineffective assistance because he failed to object to the trial court's jury charge on first degree felony murder which omitted instructions as to lesser-included offenses. Correspondingly, Petitioner alleges appellate counsel proved ineffective when he failed to appeal this issue. Petitioner did not raise this issue in his Petition for Post-Conviction Relief, and we cannot find any evidence in the transcript of the evidentiary hearing that the issue was presented to the post-conviction court. Issues not raised in a petition for post-conviction relief cannot be raised for the first time on appeal. *See* Tenn. Code Ann. § 40-30-210(f). Accordingly, this issue is waived.

Id. at \* \*8 and 9. (emphasis added).

Petitioner has not demonstrated these rulings on the jury instruction claims under state law

to be unreasonable. The State's highest court rulings on state law issues are binding on the federal

courts. Wainwright v. Goode, 464 U.S. 78, 84 (1983) (per curiam). "[I]t is not the province of a

federal habeas court to reexamine state court determinations on state law questions." Estelle v.

38

McGuire, 502 U.S. 62, 67-68 (1992). This Court concludes that the state appellate court rulings on these jury instruction claims are reasonable.

As to his claim on trial counsel's inadequate alibi investigation, Petitioner contends that counsel failed to adequately identify, locate, interview and investigate certain witnesses who could have strengthened petitioner's alibi defense or "shed light on the actions of [petitioner] on the day of the offense and also on the actions of other witnesses or potential defendants." Petitioner raised this claim was presented in his post-conviction appeal. At the state post-conviction hearing, Petitioner relied on the testimony of three witnesses at the evidentiary hearing: Dorothy Suggs, Debbie O'Bryan, and Randall Herdman. Suggs and O'Bryan testified at trial; Herdman did not.

The Tennessee Court of Criminal Appeals adopted the findings of the state trial court that petitioner failed to demonstrate either deficient performance or prejudice on this issue of trial counsel's alibi investigation.

> Petitioner alleges that trial counsel failed to adequately interview and investigate witnesses whose testimony, Petitioner contends, could have strengthened Petitioner's alibi and established the presence of another potential suspect, Richard Roberts.
>
> * * *
>
> In order to support his claim that trial counsel failed to call certain witnesses to Petitioner's detriment, Petitioner must show, through the witnesses' testimony at the evidentiary hearing, that they would have testified favorably and provided critical evidence in support of Petitioner's defense. *Black*, 794 S.W.2d at 757. Both Ms. Suggs and Ms. O'Bryan testified at trial and provided no new information other than information concerning an alleged altercation between Mr. Roberts and Ms. Shepard in which Mr. Roberts had inflicted the same type of injury on Ms. Shepard as had been inflicted on the victim. Neither one testified when the altercation took place, and Petitioner did not call either Mr. Roberts or Ms. Shepard to the stand. Detective Charvis testified that none of Mr. Roberts' fingerprints matched those found on items at the crime scene. Moreover, neither Petitioner nor Mr. Herdman identified Mr. Roberts as a member of the group that left the Pickle Factory with the victim on the afternoon of the murder. Petitioner's trial counsel did not call Mr. Johnson to testify, but it appears that his testimony would have been cumulative to Ms. Suggs'

39

testimony.

Finally, Mr. Herdman's testimony was far from exculpatory. In fact, his description of the events of October 28 actually reinforced the State's case. Mr. Herdman's testimony placed Petitioner in the car with the victim immediately prior to the murder, and Mr. Herdman testified that Petitioner, Mr. Lunceford and the victim drove off together in the victim's car to ride around in the country and drink. Whether to call a particular witness to the stand is a strategic decision made by counsel amidst the facts and circumstances at the time. Based upon a review of the record, Petitioner has failed to show by clear and convincing evidence that he was prejudiced or counsel was deficient for failing to call Mr. Johnson or Mr. Herdman to the stand and failing to investigate Mr. Roberts more thoroughly. Petitioner has also failed to sustain his burden of proof that appellate counsel was deficient in not appealing trial counsel's failure to call these witnesses to the stand or investigate Mr. Roberts further. Defendant is not entitled to relief on this issue.

Brooks, 2003 WL 288434 at * * 11, 12. (emphasis added).

From this Court's review of the state court record, Petitioner's counsel investigated and presented proof of an alibi defense for the Petitioner. If Johnson were alive and his testimony accurately described, the Tennessee Court of Criminal Appeals found that Johnson's testimony was cumulative of Sugg's testimony and that Herdman's testimony was not exculpatory. Thus, Petitioner's trial counsel's failure to call these witnesses represents a strategic decision and is not shown to be prejudicial. As a matter of federal law, these decisions does not constitute ineffectiveness of Petitioner's counsel. This Court concludes that the Tennessee state courts' decisions on this claim are a reasonable decision under federal law.

Petitioner's next sub-part of this claim is trial counsel's failure to advise Petitioner on his right to decide on whether to testify. The Tennessee Court of Criminal Appeals found on this claim:

Petitioner alleges that trial counsel failed to advise him adequately of his right to testify in his own defense at trial and failed to insure that Petitioner's waiver of his right to testify was knowing and informed. Petitioner said that both he and trial counsel were undecided as to whether Petitioner would take the stand until the trial date. While they were in the courtroom, trial counsel advised Petitioner not to testify because the State would "chew him up" if he took the stand. Petitioner admitted that

40

he agreed with trial counsel's advice at the time, but said that he did so because he had not had a chance to review his case file. In view of Mr. Lunceford's and Mr. Nelson's incriminating testimony, Petitioner argues that the jury should have had an opportunity to hear his side of the story. Trial counsel testified that he could not remember what he and Petitioner had specifically discussed concerning Petitioner's decision to testify, only that they had discussed the issue.

A criminal defendant has a fundamental constitutional right to testify in his or her own behalf, and only the defendant can personally waive the right to testify. *Momon v. State*, 18 S.W3d 152, 161 (Tenn. 1999). A right that is fundamental and personal to the defendant may only be waived if there is evidence in the record supporting an intentional and knowing waiver, and such waiver may not be "presumed from a silent record." *Id.* Although the safeguards established in *Momon* were not in effect at the time of Petitioner's trial, the post-conviction court found that Petitioner had been adequately advised by his trial counsel of his right to testify, and that Petitioner had knowingly agreed with counsel's advice that taking the stand was not in Petitioner's best interest. Based upon a review of the record, we find that the evidence does not preponderate against the post-conviction court's finding, and this issue is without merit.

Id. at 12. (emphasis added).

Under federal law, "the accused [in a criminal case] has the ultimate authority to make certain fundamental decisions regarding the case as to whether to ...testify in his or her own behalf..." Jones v. Barnes, 463 U.S. 745, 751 (1983). Tennessee law cited by the state court is in accord with this principle. Based upon the state courts' factual findings that Petitioner's testimony reflects his discussions with counsel about testifying in his own behalf, this Court deems the state courts' decisions on this claim to be reasonable and consistent with federal law.

The next subpart of the of the ineffective assistance of counsel claim about counsel's failure to object to the prosecutor's disparaging remark in closing argument about a defense witness.

Petitioner next argues that his counsel failed to provide effective assistance of counsel because trial counsel did not object to, and appellate counsel did not appeal, certain remarks made by the prosecution during closing argument. When describing Ms. O'Bryan's influence over Ms. Suggs' testimony, Petitioner's main alibi witness, the prosecutor compared Ms. O'Bryan to the coyote of Indian folklore.

41

> Ladies and gentlemen of the jury, the last area that the State is going to address is the credibility of Ms. Suggs. In western Indian lore from the Canadian border to the Mexican border, trickster runs through the methodology of Western India [sic], trickster is Coyote. Coyote lies to the Gods and lies to the Indians, to the mortals, and causes confusion between the Gods and the mortals and things are created and things are destroyed and people die and Gods fall from the Heavens because of the chaos created by the coyote, the trickster. The state would submit that there are some characteristics in [sic] trickster in Mrs. O'Brien [sic].

* * *

The factors that are relevant in determining if a particular comment is prejudicial include: (1) the conduct complained of, viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and prosecutor; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

As a general proposition, the prosecution should refrain from name calling or using derogatory remarks. Although the prosecutor may not express his personal opinion as to the credibility of the witnesses, he may draw inferences concerning their testimony which are supported by the record.

It is not improper for a prosecutor to suggest to the jury that Petitioner's alibi witnesses lied if this inference is supported by the record. *Id.* Mr. Lunceford testified at Petitioner's trial that he and Petitioner left the Pickle Factory with the victim shortly before the murder. Ms. O'Bryan and Ms. Suggs both said that Petitioner did not leave the bar on October 28 for more than a few minutes at a time. Only one version of the events leading up to the victim's murder is accurate.

At trial, Ms. O'Bryan testified that she was a bartender at the Pickle Factory in 1994 and arrived for work at 8:00 a.m. On the day of the murder, Ms. O'Bryan said that the victim, Mr. Lunceford, Petitioner, Dorothy Suggs and her husband were all present at the Pickle Factory. She could not remember specifically whether Mr. Herdman or Mr. Roberts had been in the bar, but she thought she had seen Ms. Shepard at some point. During the day, Petitioner left periodically but was gone only five or ten minutes at a time. At 2:00 p.m., Ms. O'Bryan left to buy cigarettes for the bar and returned approximately forty-five minutes later. Petitioner was still in the bar when she got back from her errands, and he was still there when she got off work at 8:00 p.m. She could not remember, however, when the victim had left.

On cross-examination, the prosecution focused primarily on questioning the accuracy of Ms. O'Bryan's memory of the events on October 28. Ms. O'Bryan admitted that Petitioner, Ms. Suggs, and Mr. Lunceford were regular patrons, and Petitioner and Mr. Lunceford were drinking a great deal in 1994. Often, Petitioner and Mr. Lunceford would arrive at the bar at 8:00 a.m. when she opened up. The victim was not as frequent a visitor to the bar as Petitioner and Mr. Lunceford. Ms. O'Bryan agreed that it was difficult to separate one day from another. She was very familiar with the regulars and often sat down to share a drink and conversation while she was working. On October 28, Ms. O'Bryan testified that she had shared four beers with the regulars after she returned from her cigarette run.

Ms. Suggs testified at trial that she was working part-time at the Pickle Factory in 1994, but she had not learned about the victim's death, whom she knew only as "Ski," until after the Petitioner was arrested. When Ms. Suggs asked when the murder occurred, Ms. O'Bryan reminded her it was the day that they were all sitting together at a big table, and the victim was buying rounds of beer. Ms. Suggs, however, maintained that her recollections of the day's details were her own, not Ms. O'Bryan's.

The record indicates that both versions of the events of October 28 were fully and ably presented to the jury, and the jury obviously credited the testimony of Mr. Lunceford. The post-conviction court noted that the prosecutor's allegory probably did not have a great deal of meaning to most people and found that Petitioner had not shown that he was prejudiced by the comment. We agree that Petitioner has not shown by clear and convincing evidence that he was prejudiced by trial counsel's failure to object to the comments or appellate counsel's failure to appeal the appropriateness of the comments. Petitioner is not entitled to relief on this issue.

Brooks, 2003 WL 288434 at **10-11. (citations to state law omitted).

Under federal law, any prosecutorial comment or argument that induces the jury to accept the government's prosecutor's opinion to the detriment of the facts of the case, is improper. United States v. Young, 470 U.S. 1, 18-19 (1985). A prosecutor may not express a personal opinion on the credibility of any witness. Id. A prosecutor's remark that the defendant was a "vicious animal" is highly improper. Darden v. Wainwright, 477 U.S. 168, 179 n.7, 180 (1986), but under all of the circumstances, that remark was found to be harmless error. Id. at 181. Thus, even if " the

43

prosecutor's remarks exceeded the permissible bounds ", the issue remains whether the remark was harmless under all of the circumstances. <u>Young</u>, 470 U.S. 13 n.10.

Applying this standard and in light of the factual context described by the Tennessee appellate court, this Court concludes that the Tennessee Court of Criminal Appeals's decision on this claim is reasonable. In <u>Darden</u> a much more offensive remark about a defendant was deemed harmless error. Because the state court's determination was reasonable and in accord with established federal law, petitioner is not entitled to relief on this claim.

Petitioner contends that trial counsel was ineffective for failing to appeal consecutive sentencing, which resulted in an effective sentence of life imprisonment plus 27 years. Petitioner raised this claim on his post-conviction appeal. The Tennessee Court of Criminal Appeals concluded that petitioner failed to show that he was prejudiced by counsel's failure to raise the issue on appeal. The court observed that petitioner's prior criminal record consisted of 19 misdemeanors, two felonies and one failed probation, supporting the trial court's finding at sentencing that petitioner has an extensive criminal record.

> According the record, Petitioner had nineteen misdemeanor convictions between 1979 and 1993 involving charges of public intoxication, marijuana possession, driving under the influence, driving with a revoked license, malicious mischief, evading arrest and traffic offenses. In addition, Petitioner was convicted of burglary, a class D felony, in 1983 for which he received a three-year sentence. The trial court suspended Petitioner's sentence, and he was placed on probation. Petitioner's probation was later  revoked, and he was ordered to serve the balance of his sentence. In 1992, Petitioner was convicted of theft of property valued between $500 and $1,000, a Class E felony, and sentenced to two years. The trial court suspended Petitioner's sentence and placed him on probation.

> If a defendant is convicted of more than one criminal offense, consecutive sentencing may be imposed at the discretion of the trial court if one or more of the criteria in Tenn. Code Ann. § 40-35-115(b) is present. As pertinent to this case, a defendant "whose record of criminal activity is extensive" is an appropriate candidate for consecutive sentencing. Tenn. Code Ann. § 40-35-1 15(b)(2). The trial court must

44

also consider the general principles of sentencing in determining the length of the sentence, and the sentence must be "justly deserved in relation to the seriousness of the offense."

Based on a careful review of the record, we find that Petitioner has failed to show that he was prejudiced by appellate counsel's failure to request a transcript of the sentencing hearing and raise the issue of consecutive sentencing on appeal. Specifically, Petitioner has failed to show that there is a reasonable probability that the outcome of his appeal would have been different had a transcript of the sentencing hearing been provided this Court. Petitioner's prior criminal record, consisting of nineteen misdemeanors, two felonies and one failed probation, clearly supports the sentencing court's finding that Petitioner has an extensive criminal record. *See State v. Pettus*, 986 S.W.2d 540, 545 (Tenn. 1999)(the defendant's record of two thefts, and unlawful weapons conviction, contributing to the delinquency of a minor and driving on a revoked license was sufficient to support consecutive sentence). Furthermore, the post-conviction court did not make a finding that Petitioner was prejudiced, that is, the result of the appeal would have been different. Accordingly, we reverse the judgment of the post-conviction court as to this issue.

(Addendum 4, Doc. 3, p. 14). (other citations omitted).

Here, on his state post-conviction appeal, Petitioner actually received the benefit that he alleges was denied on direct appeal. Thus, Petitioner cannot establish prejudice on this claim.

A court must examine not only to the individual errors of counsel, but must also view the effect of the errors cumulatively. Draper v. Adams, 215 F.3d 1325, 2000WL712376 *3 (6th Cir. May 23, 2000). Viewing counsel's cited omissions collectively, the Court concludes the Petitioner's counsel were not ineffective within the meaning of the Sixth Amendment

On the sum of Petitioner's ineffectiveness of counsel claim, the state courts' determinations are reasonable in light of the evidence presented at the post-conviction hearing and in accord with the standard set forth in Strickland. To the extent petitioner seeks to expand this claim to include additional grounds not specifically raised in the Tennessee state courts, those sub-parts of this claim are procedurally defaulted.

45

## 2. Sufficiency of the Evidence

Petitioner raised an insufficiency of the evidence claim on direct appeal to the Tennessee Court of Criminal Appeals. As set forth earlier, supra at pp. 3-6, that court rendered a detailed recitation of the evidence at Petitioner's criminal trial and rejected his insufficiency claim. For a insufficient evidence claim under the Fourteenth Amendment, Jackson v. Virginia, 443 U.S. 307 (1979) sets the governing standard:

> ...[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to `ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon `jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

Id. at 318-19 (emphasis added with footnotes and citations omitted).

In a word, if any rational finder of fact would accept the evidence as establishing each essential element of the crime, the Jackson standard of review is satisfied. Id. at 324. The State's highest court rulings on state law issues are binding on the federal courts. Wainwright, 464 U.S. at 84. "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions." Estelle, 502 U.S. at 67-68. Circumstantial evidence need not remove every reasonable hypothesis except that of guilt. Tilley v. McMackin, 989 F.2d 222, 225 (6th Cir. 1993).

46

In its ruling on the sufficiency of the evidence claim on direct appeal, the Tennessee Court of Criminal Appeals concluded:

> The decision was wholly one for the jury to make as trier of fact. Unfortunately for the defendant, the jury's discharge of its function resulted in accreditation of Lunceford's testimony and weighing and evaluating the state's evidence over that brought forward by the defense. Clearly, a rational trier of fact, such as the jury at the defendant's trial, could find the defendant guilty beyond a reasonable doubt of each of the four crimes on the evidence presented.

Brooks, 1998 WL 299267, *6.

Here, Petitioner cut the victim's throat with a knife, "ordered Lunceford to get the wallet" and "gave Lunceford about $40 from the wallet as they were leaving." Id. at 2. The victim's wallet was already on the trunk of the car at the time of the killing, and a reasonable juror could certainly infer that the murder was committed in the perpetration of a robbery. To be sure, at trial, Lunceford, his accomplice in the crime, testified under a conditional grant of immunity and denied that he and the petitioner had any prior plan to rob the victim. Id. at * 1. That testimony, however, does not negate the other actual facts of the case that satisfy the essential elements of first degree felony murder as determined by the state courts that Petitioner killed the victim during an aggravated robbery.

The Tennessee appellate court actually cited and applied the Jackson standard and concluded that the weight and credibility of the trial testimony of witnesses are entrusted to the jury as trier of fact and that, "[t]he decision [in this case] was one which hinged on the jury's assessment of the credibility of the witnesses, particularly Edwin Lunceford, and the weight and value which should be afforded the evidence. . . . [A] rational trier of fact, such as the jury at the defendant's trial, could find the defendant guilty beyond a reasonable doubt of each of the four crimes on the evidence presented." Brooks, 1998 WL 299267 Id. at 14. After its extensive review of the evidence, the state

47

court deemed the testimony of Lunceford, an accomplice was the critical proof that established the Petitioner's guilt. Uncorroborated accomplice testimony is sufficient to support a conviction under the federal constitution. Takacs v. Engle, 768 F.2d 122, 127 (6th Cir. 1985).

Viewing the state court's review of the evidence and Lunceford's testimony evidence in a light most favorable to the State, as required here, the Court concludes that this claim lacks merit.

Accordingly, the Court concludes that the Respondent's motion for summary judgment (Docket Entry No. 45) should be granted and the petition for the writ should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___30th___ day of March, 2007.

WILLIAM J. HAYNES, JR.
United States District Judge

48